AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

<table>
<tr><td>In the Matter of the Search of<br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i><br><br>Facebook User ID: 100023226604522<br>listed in "Attachment A"</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No. 2:22-cm-11</td></tr>
</table>

<table>
<tr><td><b>FILED</b><br>US DISTRICT COURT<br>WESTERN DISTRICT<br>OF ARKANSAS<br><br>Feb 2, 2022<br><br>OFFICE OF THE CLERK</td></tr>
</table>

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT "A."  This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3) (A) and Federal Rule of Criminal Procedure 41

located in the _____ Western _____ District of _____ Arkansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C 2339A | Providing Material Support to Terrorists |

The application is based on these facts:

See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Warren Seals, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/2/22

_____
*Judge's signature*

City and state:  Fort Smith, Arkansas

U.S. Magistrate Mark Ford
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USER ID NUMBER
100023226604522 THAT IS STORED AT
PREMISES CONTROLLED BY META
PLATFORMS, INC.

Case No. 2:22-cm-11

**FILED UNDER SEAL**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Warren A. Seals, first being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application for a search warrant pursuant to

18 U.S.C. § 2703 for all content and other information associated with the accounts identified by

Facebook User ID 100023226604522 currently associated with user name "OG Quattro Johnson,"

(the "TARGET ACCOUNT") that is stored at premises owned, maintained, controlled, or operated

by Meta Platforms, Inc. ("PROVIDER" or "Facebook"), an electronic communications service

and/or remote computing service provider headquartered at 1601 Willow Road, Menlo Park,

California. This affidavit is made in support of an application for a search warrant under 18 U.S.C.

§§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government

copies of the information (including the content of communications) further described in Section

I of Attachment B. Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review that information to locate the items described in

Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.       I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and have been

since April 30, 2021.  I am currently assigned to the Little Rock Field Division's Fort Smith

Resident Agency on the National Security Squad. As part of my duties, I investigate national security matters related to domestic and international terrorism.

3.     Prior to my appointment as a Special Agent, I served nine years as a sworn law enforcement officer with the Crawford County Sheriff's Office located in Van Buren, Arkansas. During this time, I served five years as a criminal investigator, including four years assigned as a federally deputized Task Force Officer ("TFO") with the FBI's River Valley Child Exploitation and Human Trafficking Task Force. As part of my duties as a TFO, I investigated criminal violations committed using facilities of interstate and foreign commerce such as cell phones and computers connected to the internet. In addition to the training I received at the FBI Academy in Quantico, Virginia, I have received additional training and have experience investigating potential violations of federal laws prohibiting domestic and international acts of terrorism. I have participated in the execution of numerous local, state, and federal search warrants and arrest warrants, involving state and federal criminal violations, including warrants ordering the search and seizure of electronic data and social media account information.

4.     The facts in this Affidavit come from my personal observation, my training and experience, and information obtained from other agents, witnesses, and sources. This Affidavit is intended to show merely that there is probable cause for the requested warrant; as such, I have not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this Affidavit, there is probable cause to believe that the TARGET ACCOUNT contains evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. § 2339A (providing material support to terrorists), Title 18 U.S.C. § 1114 (murder of officers and employees of the United States), and Title 18 U.S.C. § 842(p) (unlawful acts, distribution of information relating to explosives, destructive devices, and weapons of mass destructions)

(collectively, the "SUBJECT OFFENSES"). There is also probable cause to search the information described in Attachment A for evidence and instrumentalities of the SUBJECT OFFENSES further described in Attachment B.

6.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. §§ 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**Overview of Applicable Law**

7.     18 U.S.C. § 2339A, Providing Material Support to Terrorists provides, in pertinent part, that:

> Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 956 . . . 1114 . . . shall be fined under this title, imprisoned not more than 15 years . . .

8.     Section 2339A(b)(1) defines "material support or resources," for purposes of Section 2339A, as:

> [T]he term "material support or resources," means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

9.     18 U.S.C. § 1114, in turn, makes it unlawful to kill or attempt to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or

on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance.

10.     18 U.S.C. 842(p) makes it unlawful for any person to teach or demonstrate the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute by any means information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, with the intent that the teaching, demonstration, or information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence.

## The Taliban

11.     The Taliban is an Islamic fundamentalist paramilitary organization and political movement based principally in Afghanistan, dedicated to the imposition of strict Islamic law in Afghanistan.

12.     The Taliban engaged in a public insurgency campaign to regain control of Afghanistan after losing control of Afghanistan in 2001 as a result of the U.S. and NATO-led invasion of Afghanistan, which is also known as Operation Enduring Freedom–Afghanistan. As part of this campaign, the Taliban conducted numerous suicide bombings, targeted killings, assassinations, and hostage takings against the Afghan government, U.S. military forces, and American civilians. In August 2021, the Taliban regained control of Afghanistan following the withdrawal of U.S. and NATO forces. Since that time, the Taliban has acted as the "de facto" government of Afghanistan.

13.     The Taliban often publicly accepted responsibility for these terrorist attacks through statements issued to the media or posted online. For example, the Taliban has claimed responsibility for the following acts of terror, among others:

     a.     In October 2012, in Helmand Province, the Taliban killed six police officers in an "insider" attack, carried out by Taliban members posing as members of the Afghan police. In claiming responsibility for the attack, a Taliban spokesman stated that the Taliban carried out the attack using a "mujahid who had infiltrated and penetrated the police ranks."

     b.     In June 2013, the Taliban launched a rocket attack against coalition forces at Bagram Air Base, outside of Kabul. The attack killed four American soldiers.

     c.     In May 2015, a Taliban suicide bomber detonated a car bomb near the airport in Kabul, hitting a vehicle used by European Union Police advisory officials. Three people were killed, including one British security contractor.

     d.     In May 2015, A Taliban gunman opened fire at a guesthouse in an upscale area of central Kabul frequented by foreigners. The assault lasted five hours and killed 14 people, including an American. In claiming responsibility for the attack, a Taliban spokesman stated the "occupying forces should realize that they are not safe from our attacks under any cover or in any location."

     e.     In August 2018, a Taliban suicide bomber detonated a bomb outside a U.S. air base in Parwan Province, Afghanistan, killing three NATO soldiers and wounding one American soldier.

## **PROBABLE CAUSE**

     14.     The FBI is investigating Alan Louis CRAWFORD, a/k/a Omar Usman Khalid (hereafter "CRAWFORD") regarding possible violations of the SUBJECT OFFENSES.

     15.     As set forth in more detail below, CRAWFORD, using among other things, the TARGET ACCOUNT, took steps to provide material support or resources, including himself as personnel and services, to the Taliban in Afghanistan by working within the Taliban's infrastructure

and government; by providing funds acquired through CRAWFORD's VA Benefits to the Taliban; by working to get U.S. personnel captured and killed by identifying U.S. citizens and assets in Afghanistan to the Taliban. Among other things, CRAWFORD purchased a plane ticket to Afghanistan, sought to obtain tactical clothing, and claimed to maintain contact with individuals located in Pakistan and Afghanistan. On September 30, 2021, CRAWFORD was arrested on Arkansas state charges relating to, among other things, making "terroristic threats." Accordingly, as described below, there is probable cause to search the TARGET ACCOUNT for evidence of the SUBJECT OFFENSES.

16.     On or about September 1, 2021, an FBI confidential human source (the "CHS") contacted the FBI and stated that they had been communicating with CRAWFORD through Facebook Messenger, with CRAWFORD using the TARGET ACCOUNT.[1]

17.     According to the CHS, although the CHS had known CRAWFORD since late 2016, the CHS had not communicated with CRAWFORD in recent years. In August 2021, however, CRAWFORD contacted the CHS using the TARGET ACCOUNT through Facebook Messenger. The CHS identified the TARGET ACCOUNT as belonging to CRAWFORD based on photographs posted by the user of the TARGET ACCOUNT.

---

[1] The CHS has worked as a paid source for the FBI at various times since approximately 2011. Prior to 2011, the CHS had a criminal history, dating back to 1991, which included felony and misdemeanor arrests. During the CHS's initial period of work as a paid source in 2011, the CHS provided false information to officers in the course of the CHS's arrest in an unrelated incident, and publicly disclosed the CHS's status as an FBI source; as a result, the FBI terminated the relationship with the CHS. The CHS was reactivated as a source by the FBI in 2016 in connection with an investigation that lasted approximately two years. The CHS was reactivated again in the fall of 2021 after providing the FBI with information relevant to this investigation. Subsequent to the CHS's reactivation in 2016, the CHS's credibility has not been drawn into question. Information provided by the CHS in this and in other investigations has been corroborated in part by, among other things, consensually monitoring recordings, physical surveillance, subpoena and search warrant returns, and arrests.

18.     During a Facebook Messenger conversation between the CHS and CRAWFORD (using the TARGET ACCOUNT), on or about August 31, 2021, CRAWFORD stated, in sum and substance that CRAWFORD wanted to go to Kabul, Afghanistan to join the Taliban and fight. Using the TARGET ACCOUNT, CRAWFORD sent the CHS a photograph of the airline reservations for tickets that CRAWFORD claimed to have purchased for purposes of traveling to join the Taliban. According to the photograph shared by CRAWFORD, CRAWFORD's flight was to leave Los Angeles International Airport ("LAX") via a commercial foreign airline ("Airline 1") on October 22, 2021, traveling through Istanbul, Turkey before terminating in Kabul, Afghanistan on October 24, 2021.

19.     Thereafter, the CHS and CRAWFORD continued to communicate using the TARGET ACCOUNT, including using the TARGET ACCOUNT's Facebook messenger, video, and chat applications. Those communications have continued up to and including September 30, 2021, and are summarized in sum and substance below.

20.     On or about September 4, 2021, for example, CRAWFORD, using the TARGET ACCOUNT, discussed killing FBI and CIA agents if those U.S. employees and agents were to follow him to Afghanistan. That same day, CRAWFORD also discussed killing and beheading individuals, including his wife should she disobey him.  CRAWFORD further stated that he did not intend to take electronics with him when he traveled because he did not want to be hacked.

21.     Also on or about September 4, 2021, CRAWFORD, using the TARGET ACCOUNT, said he believed he can join the Taliban in Afghanistan and not be charged with a crime because the Taliban is not a designated Foreign Terrorist Organization, according to the U.S. State Department.

22.     On or about September 5, 2021, CRAWFORD discussed deleting the TARGET ACCOUNT, and asked the CHS to communicate through a different platform because CRAWFORD did not want to be observed or tracked by federal agents.[2] Nonetheless, CRAWFORD and the CHS continued to communicate through the TARGET ACCOUNT.

23.     On or about September 9, 2021, CRAWFORD, using the TARGET ACCOUNT, told the CHS that CRAWFORD believed the Haqqani Network ("HN") had infiltrated the Taliban and CRAWFORD was aware of other Foreign Terrorist Organizations ("FTO") in partnership with the new Afghani regime.[3]

24.     On or about September 9, 2021, CRAWFORD, using the TARGET ACCOUNT, sent rifle pieces to the CHS via U.S. priority mail. CRAWFORD stated he would not need the rifle parts due to his travel to Afghanistan.

25.     On or about September 11, 2021, CRAWFORD, using the TARGET ACCOUNT, sent the CHS articles regarding the Taliban and suicide bombings. CRAWFORD sent the CHS an article regarding Saddam Hussein. According to the CHS, the article provided information on how Hussein allegedly paid families for suicide bombings in Palestine. CRAWFORD also sent the CHS articles on where to purchase firearms in Pakistan and Afghanistan. Again, CRAWFORD talked about killing FBI agents that followed him to Afghanistan.

26.     On or about September 13, 2021, CRAWFORD, using the TARGET ACCOUNT, told the CHS that he purchased a "tactical load-out" vest and tactical pants. Approximately a week later, CRAWFORD advised the CHS that he received the holster he purchased for his vest, and that

---

[2] On or about October 6, 2021, the FBI served a preservation letter to Facebook requesting Facebook preserve information and data regarding the TARGET ACCOUNT.
[3] HN has been continuously designated as an FTO by the U.S. Department of State since 2012. Based on my training and experience, I am aware that HN has worked, and continues to work, closely with the Taliban to further its goal of imposing sharia law in Afghanistan.

he already fit a "Sig P232" in the holster and he wanted to see if a "Glock" would fit.  Based on my training and experience, and my familiarity with this investigation, I believe the references to "Sig P232" and a "Glock" are references to types of semiautomatic handguns.  On or about September 30, 2021, CRAWFORD advised the CHS that he intended to bring the tactical clothing and some rifle sights to Afghanistan with him.

27.     On or about September 16, 2021, CRAWFORD, using the TARGET ACCOUNT, asked the CHS to send CRAWFORD a Taliban flag in order to "run through town" with the flag; CRAWFORD also stated that he may come back to the U.S. as a "jihadi."[4]

28.     Also on or about September 16, 2021, CRAWFORD, using the TARGET ACCOUNT, stated, "Anybody working with them [the FBI] that the Taliban catches is gonna get their fucking head cut off, righteously."

29.     On or about September 20, 2021, CRAWFORD, using the TARGET ACCOUNT, praised the loss of women's rights and the death of women under Taliban rule; CRAWFORD also sent the CHS a link to an online article on the subject.  That same day, CRAWFORD stated that he wanted to work as a police officer or in another role within Afghanistan's infrastructure, such as the water department.  CRAWFORD stated he wanted to work at Kabul airport as a law enforcement officer.  CRAWFORD further discussed how the U.S. would be unable to extradite him from Afghanistan.

30.     Also on or about September 20, 2021, CRAWFORD, using the TARGET ACCOUNT, listed the various firearms he wanted to purchase once he was in Afghanistan, including a "full auto AK," an "RPG," and a "PK machine gun."  Based on my training and experience, and

---

[4] Based on my training and experience, I am aware that the term "jihadi" is often used in an extremist context to reference a person willing to fight and die for his or her radical interpretation of Islam.

my familiarity with this investigation, I believe the reference to a "full auto AK," and a "PK machine gun" are references to fully automatic firearms; I believe the reference to an "RPG" is a reference to a rocket-propelled grenade.

31.      On or about September 21, 2021, CRAWFORD, using the TARGET ACCOUNT, spoke with the CHS and described the fact that ISIS burned people alive as "proper punishment." Based on my training and experience, and my familiarity with this investigation, I believe that CRAWFORD was referring to another FTO, the Islamic State in Iraq and al-Sham, which is also commonly referred to by its acronym ISIS.

32.      On or about September 27, 2021, CRAWFORD, using the TARGET ACCOUNT, stated to the CHS, "If anybody wants to fucking avoid trouble with the feds, go to Afghanistan. You know why? Maybe it's going to backfire on me, but the last time I checked, the fucking Haqqani guy that's in power there, they got a million dollar price tag on his head. I don't see them getting that fool, do you?" Based on my training and experience, and my familiarity with this investigation, I believe that CRAWFORD's reference to the "fucking Haqqani guy that's in power" is a reference to Sirajuddin Haqqani, the leader of HN who in 2021 was appointed by the Taliban to be the acting interior minister. Haqqani also appears on the FBI's Most Wanted List; both the FBI and the State Department have offered millions in rewards for his capture.

33.      Also on or about September 27, 2021, CRAWFORD expressed an interest to the CHS in people being hanged and beheaded by the Taliban and CRAWFORD asked for CHS's assistance in finding photographs of these acts. CRAWFORD also spoke to the CHS about how there have not been many viable terrorist attacks in the U.S. In particular, CRAWFORD referred to Timothy McVeigh and the Oklahoma City bombing and the Las Vegas shooter, calling him a "sufficient killer."

34.     In August of 2021, CRAWFORD applied for a passport. On or about September 28, 2021, CRAWFORD expressed concern about getting his passport. CRAWFORD told the CHS he would go back to Mexico if he did not receive his passport in time for his trip to Afghanistan.

35.     On or about September 29, 2021, CRAWFORD, using the TARGET ACCOUNT, told the CHS that once in Afghanistan he wished to acquire a "mujahideen" roommate with whom, among other things, he would work to get American spies and agents killed, and that he himself wished to become a mujahideen.[5] CRAWFORD further stated that he intended to use his VA benefits to fund the mujahideen, and that he wanted to burn the U.S. flag in Afghanistan, saying that the U.S. got their "assess kicked" and that their "last thirteen pieces of shit died on this soil…Fuck America." Based on my training and experience, and my familiarity with this investigation, I am aware that in the course of the withdrawal of U.S. forces and personnel from Afghanistan, on August 26, 2021, ISIS-Khorasan detonated suicide bombs at the Kabul International Airport, killing thirteen U.S. military service members. I am also aware that CRAWFORD was a member of the American military and that he receives benefits from the Department of Veteran's Affairs, which is often referred to as the "VA."

36.     Also on or about September 29, 2021, CRAWFORD, using the TARGET ACCOUNT, stated to the CHS that he would be willing to teach others how to build Improvised Explosive Devices ("IEDs"); in particular, he stated that he "could advertise it on all these fringe websites and sell like a subscription to bomb-making school and shit like this, like I could teach people how to make detonators and things through videos and through cell phones and all this shit. You know like Talib does, right?" Based on my training and experience and the context of the

---

[5] Based on my training and experience, I am aware that the term "mujahideen" is commonly used by Islamic extremists to refer to guerilla-type militant fighters seeking to expel non-Muslims from Afghanistan.

conversation, I believe that CRAWFORD's reference to Talib is shorthand for the Taliban. The CHS advised CRAWFORD not to talk like this online, after which CRAWFORD responded, "No, I'm not doing anything illegal. I'm saying, I can do this when I go to Afghanistan... I'm saying I can teach people to umm, the dangers of terrorism through this...teaching them that, okay, well, this is how it's done. Don't do it, but I'm doing this to teach you to stop terrorism. I'm thinking I can make money doing this and then I can feed the people."[6]

37.     At various times, CRAWFORD, using the TARGET ACCOUNT, indicated to the CHS that CRAWFORD was in communication with people overseas that could assist him in his goal of reaching Afghanistan. For example, on at least one occasion, CRAWFORD, using the TARGET ACCOUNT, sent the CHS a screenshot with a WhatsApp phone number and conversation. The conversation showed CRAWFORD asking the individual about the dress code and gym locations in Afghanistan. CRAWFORD sent a text saying the individual was "todays afghani informant..." implying that the phone number belonged to an individual in Afghanistan. Similarly, on or about September 16, 2021, CRAWFORD told the CHS he had a friend in Pakistan, and that he had been speaking with this individual regarding places to live once he is in Afghanistan. On or about September 24, 2021, CRAWFORD, again, told the CHS that he had discussed with someone in Afghanistan his planned travel, and whether he would be accepted by the locals in Afghanistan.

---

[6] I have personally reviewed many of the recorded messages and conversations between CRAWFORD and the CHS. Based on that review, I am aware that during some of CRAWFORD's conversations with the CHS, CRAWFORD made reference to being surveilled or harassed by the FBI, and expressed a belief that the FBI sent informants to record his conversations and/or to investigate him. CRAWFORD also made several self-serving and qualifying statements in an attempt to contradict other statements he had made. For example, despite the conversations recounted above, CRAWFORD at times disclaimed any intent to become a terrorist and stated he only wanted to "settle down" and get married in Afghanistan. CRAWFORD further stated that the FBI was trying to "make terrorists," and that "[t]he game is to make me take a rifle, go in and fucking shoot twenty people."

38.     According to the CHS, CRAWFORD runs while carrying a firearm; the CHS has also captured conversations with CRAWFORD in which CRAWFORD has stated that he was running up to ten miles a day and intends to keep running while in Afghanistan. I have personally observed that the TARGET ACCOUNT had a video posted in which CRAWFORD can be seen trail-running while wearing a tactical vest and carrying a firearm.

39.     According to the CHS, and as reflected in consensually recorded conversations, CRAWFORD told the CHS that he asked the FBI and other federal law enforcement agencies, "if I could be a fuckin' Taliban officer, hypothetically speaking..." and that the FBI and other law enforcement agencies would not answer the question. Likewise, on September 20, 2021, CRAWFORD advised the CHS that he was planning to call the FBI and ask "if I want to work for the water department for the Islamic Emirates, is that against U.S. law to work for a government position over there or be a police officer." CRAWFORD continued, "I wanna know if it's a crime. If it's not a crime, fuck it. I'm gonna go be a police officer while I'm there."

40.     On or about September 30, 2021, CRAWFORD, using the TARGET ACCOUNT, sent the CHS a photograph purporting to be of CRAWFORD's call log, reflecting the different law enforcement agencies CRAWFORD allegedly called to inquire regarding the legality of U.S. citizens joining the Taliban. The CHS thereafter provided this photograph to the FBI.

41.     On or about November 8, 2021, I reviewed the aforementioned photo of CRAWFORD's call log provided by the CHS. According to open source searches, some of the phone numbers that appear on the call log photograph are associated with the Little Rock Department of Alcohol, Tobacco, and Firearms ("ATF"), Little Rock Immigration and Custom Enforcement Homeland Security Investigations ("HSI"), U.S. Citizenship and Immigration Services, and the FBI

Los Angeles Division. According to the photograph of the call log, however, no calls lasted longer than two minutes.

42.    According to the CHS, during a Facebook Messenger video chat with CRAWFORD (using the TARGET ACCOUNT) on or about September 21, 2021, the CHS asked CRAWFORD about CRAWFORD's residence. CRAWFORD then showed the CHS the outside of CRAWFORD's building through the video. On or about September 24, 2021, the CHS attempted to locate CRAWFORD's residence, and reported that CRAWFORD appeared to reside in Fort Smith, Arkansas. The CHS subsequently provided the FBI with screenshots from Google Maps depicting the area where the CHS believed CRAWFORD's residence was located.

43.    On or about September 30, 2021, I personally conducted physical surveillance of the location shown in the Google Maps screenshots shared by the CHS and I was able to confirm that the location was CRAWFORD's residence. During the physical surveillance, I observed a vehicle registered to CRAWFORD parked outside the residence. I also observed CRAWFORD exiting the residence and accessing the vehicle.

44.    From reviewing information provided by Airline-1, I have learned that, on or about September 1, 2021, a one-way airline ticket in CRAWFORD's name was purchased through a third-party travel booking website for travel on Airline-1; the flight was to depart on October 22, 2021 from Los Angeles, California, with a stop in Istanbul, Turkey, before continuing on to Kabul, Afghanistan.

45.    From reviewing law enforcement reports, speaking with law enforcement officers, and reviewing open source newspaper articles, I have learned that on or about May 24, 2016, CRAWFORD and his then-wife were arrested after making terroristic threats to a waitress in a Prairie Grove, Arkansas diner. On or about June 8, 2016, CRAWFORD was arrested after making

terroristic threats to a car salesman in Fort Smith, Arkansas. The Rogers, Arkansas Police Department also issued a warrant for CRAWFORD's arrest based on 2018 conduct that resulted in charges relating to violations of Arkansas Criminal Code 5-54-203 ("terroristic threats"), and Arkansas Criminal Code 5-71-208 ("harassment"). On or about September 30, 2021, CRAWFORD was arrested on a warrant relating to the Rogers Police Department's 2018 charges; CRAWFORD was ordered detained and remained in custody until January 31, 2022. At the time of CRAWFORD's September 30, 2021 arrest, an assault rifle was located in the passenger seat of CRAWFORD's vehicle.

46.     Based on conversations with police officers of the Rogers Police Department, as well as my review of travel records from the U.S. Customs and Border Protection ("CBP"), I understand that, since 2016, in addition to Arkansas, CRAWFORD has resided in Oklahoma, Los Angeles, and Mexico. CRAWFORD made several border crossings between the U.S. and Mexico between 2017 and 2020.

47.     On or about November 15, 2021, I served a grand jury subpoena to Facebook, Inc., requesting subscriber information associated with the TARGET ACCOUNT. According to records received from Facebook, a phone number which had been identified by the CHS as belonging to CRAWFORD, was verified as a log-in source for the user of the TARGET ACCOUNT on February 15, 2021. The records further showed that an account associated with an online payment platform, using the email address alancrawford2020.200@gmail.com, had been associated with the TARGET ACCOUNT.

48.     On or about February 1, 2022, I observed an entry posted to the Target Account by CRAWFORD. The post was created on February 1, 2022 at approximately 6:00 AM. The post contained a video and a photo depicting CRAWFORD running outside and screenshot photos

depicting maps, implying the path ran by CRAWFORD.  The caption read, "First day out 15 mile round trip."

## TECHNOLOGICAL INFORMATION

49.      Meta Platforms, Inc. owns and operates a free-access social networking website named "Facebook" that can be accessed at https://www.facebook.com.  Facebook allows its users to establish accounts with Meta Platforms, Inc., and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

50.      Facebook asks users to provide basic contact and personal identifying information to Facebook Inc., either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

51.      Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that users' "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

52.      Facebook users can select different levels of privacy for the communications and

information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those device(s).

53.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

54.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when he or she uploaded the photograph or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photograph or video. When a user is tagged in a photograph or video, he or she receives a notification of the tag and a link to see the photograph or video. For Facebook's purposes, the photos and videos associated with a

user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

55.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

56.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

57.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

58.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

59.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

60.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

61.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

62.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

63.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

64.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

65.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including

the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

66.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

67.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).   In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

68.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by

Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.

69.      Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the IP addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geolocation into some of its services.  Geolocation allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

70.      Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information,

and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

71.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(l)(A) and 2703(c)(1)(A), by using the Search Warrant to require Facebook to disclose to the Government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

72.    Based on the forgoing, I request that the Court issue the proposed search warrant.

73.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

74.    I further request that the Court order that all papers in support of this Application, including the Affidavit and Search Warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation, the full scope of which is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Warren Seals
Special Agent, FBI

Sworn and subscribed before me this ___2___ day of __February__ , 2022.

Honorable Mark E. Ford
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This Search Warrant applies to information associated with the following Facebook profile with the user ID:

(1) User ID: 100023226604522

Such information is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

**Pursuant to the preclusion of notice provisions of 18 U.S.C. § 2705(b), Facebook, Inc. shall not disclose the existence of this search warrant or the search of the above-referenced Facebook user ID's to any person or entity, except that Facebook may disclose the attached warrant to an attorney for Facebook for the purpose of receiving legal advice, and Facebook shall disable or pre-empt any automatic notifications or similar processes relating to the above-captioned Facebook user ID's that may cause the existence of this search warrant and the search of the Facebook user ID's to be disclosed outside of Facebook, Inc.**

**ATTACHMENT B**

**Particular Things to Be Seized**

I.    **Information to be disclosed by Meta Platforms, Inc.:**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A for the time period of January 1, 2021 to Current:

1) All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

2) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

3) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

4) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group

**Page 25 of 30**

identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

5) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

6) All other records of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, closed group messaging, video and voice calling history, and pending "Friend" requests;

7) All "check ins" and other location information;

8) All IP logs, including all records of the IP addresses that logged into the account;

9) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

10) All information about the Facebook pages that the account is or was a "fan" of;

11) All past and present lists of friends created by the account;

12) All records of Facebook searches performed by the account;

13) All information about the user's access and use of the Facebook Marketplace;

14) The types of service utilized by the user;

15) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

16) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

17) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 10 days of service of this warrant.

## II.    Information to be seized by the Government:

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18 U.S.C. § 2339A (providing material support to terrorists), Title 18 U.S.C. § 1114 (murder of officers and employees of the United States), and Title 18 U.S.C. § 842(p) (unlawful acts, distribution of information relating to explosives, destructive devices, and weapons of mass destructions) and other identified and unidentified associates since January 1, 2021, including for each user ID identified on Attachment A, information pertaining to the following matters:

(1) the identification or location of the user(s) of the account;

(2) how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the SUBJECT OFFENSES and to the account user(s);

(3) the identification of the subjects and other persons, including photographs, posts, and videos depicting clothing and other articles and paraphernalia that reflect evidence of terrorism, terrorist group membership, or violent ideology;

(4) the identification of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the SUBJECT OFFENSES; or (ii) communicated about matters relating to the SUBJECT OFFENSES, including records that help reveal their whereabouts;

(5) Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts;

(6) Communications, and other information/records/data, between the account user and other individuals regarding the support of terrorism, including the provision of material support and resources to the Taliban;

(7) Evidence indicating the account owners' state of mind as it relates to the crime under investigation;

(8) Identification of co-conspirators, accomplices, and aiders and abettors in the commission of the above offenses, including records that help reveal the whereabouts such person(s);

(9) The identity of the person(s) who communicated with the user about matters relating to the Taliban, or the support of terrorism, including records that help reveal the whereabouts of such person(s);

(10) Evidence concerning the acquisition, use, maintenance, or building or assembly of explosives, destructive devices, firearms, or weapons of mass destruction, including evidence regarding distribution or receipt of instructions relating to the acquisition, use, maintenance, or building or assembly of explosives, destructive devices, firearms, or weapons of mass destruction;

(11) Evidence concerning planning, conspiring, or preparing to commit attacks on U.S. personnel;

(12) Records and information referring, or  relating, to travel, including travel plans, itineraries, reservations, bookings, tickets, and the means and sources of payment for travel;

(13) Records and information referring, or relating, to plans to commit a terrorist attack, to attack or murder U.S. personnel, or to fight with the Taliban, including, without

limitation, funding, materials, maps, disguises, aliases, weapons, or other materials that may assist with an attack;

(14)   Any conspiracy, planning, or preparations, including financing, to commit the SUBJECT OFFENSES, or efforts to conceal evidence of the SUBJECT OFFENSES from law enforcement, or to flee prosecution for the SUBJECT OFFENSES;

(15)   The state of mind of the subjects and/or co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation, planning, knowledge, or experience, including but not limited to tactical training or tactical equipment, related to the SUBJECT OFFENSES;

(16)   Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.